Kingfisher County Oklahoma
**FILED**
SEP 29 2014
LISA MARKUS, COURT CLERK
BY_____
DEPUTY

IN THE DISTRICT COURT OF KINGFISHER COUNTY, OKLAHOMA

Duncan Frank, on behalf of himself )
and all others similarly situated, )
)
    Plaintiffs, )
)
v. ) Case No. CJ-2014-65
)
Crawley Petroleum Corp., )
)
    Defendant. )

## CLASS ACTION PETITION

Plaintiff, Duncan Frank, brings this claim on behalf of himself and the class of all other persons similarly situated (the "Class Members") against Defendant and, in support of these claims, states as follows:

### NATURE OF THE ACTION

1. Plaintiff brings claims based upon Defendant's underpayment or non-payment of royalties on natural gas and/or constituents of the gas stream produced from wells in Oklahoma through improper accounting methods, all as more fully described below.

### VENUE AND JURISDICTION

2. Duncan Frank is a royalty owner in an Oklahoma well owned in part and operated by Defendant.

3. This Court has jurisdiction over Defendant in that some of its wrongful acts occurred to Plaintiff and the Class in this County.

4. Venue is proper in this Court for one or more of the following reasons: (i) some of the wrongful acts and damages occurred in this County; (ii) one or more Class Members reside in this County; and (iii) Defendant does substantial continuous business in this County.



EXHIBIT 1



COPY

## PARTIES

5. Plaintiff has a royalty interest in the Young #1 well in Kingfisher County, Oklahoma. Defendant owns all or part of the working interest in and pays royalty to Plaintiff on the Young #1 well. During some or all of the relevant times, Defendant has operated the well.

6. Defendant is believed to be an Oklahoma corporation with its principal place of business in Tulsa, Oklahoma. Defendant can be served by serving The Corporation Company, 1833 S. Morgan Rd., Oklahoma City, OK 73128.

7. Defendant is in the business of producing and marketing gas and constituent products from the wells in which Class Members hold royalty interests.

8. Plaintiff does not know the amount in controversy, but Defendant should. Plaintiff's individual claim would be worth far less than $75,000. Plaintiff does not assert any federal claims. The Class is believed to be composed of over 2/3rds Oklahoma residents and citizens who receive their royalties on a monthly basis in Oklahoma and 1099s in Oklahoma annually.

9. The acts charged in this Petition as having been done by Defendant were authorized, ordered, or done by officers, agents, employees, or representatives, while actively engaged in the conduct or management of Defendant's business or affairs, and within the scope of their employment or agency with Defendant.

## CLASS ACTION ALLEGATIONS

10. Plaintiff brings this action individually and, pursuant to 12 O.S § 2023 (A) and (B)(3), as representative of a Class defined as follows:

> All royalty owners of Crawley Petroleum Corp. from Oklahoma wells in Blaine, Caddo, Canadian, Custer, Dewey, Ellis, Garfield, Garvin, Kay, Kingfisher, Logan, Major, Noble, Roger Mills, Woods, and Woodward Counties that have produced gas and/or gas constituents (such as residue gas, natural gas liquids, helium, nitrogen, or condensate) from January 1, 1993 to the time Class Notice is given.

Excluded from the Class are: (1) Office of Natural Resources Revenue f/k/a the Mineral Management Service (Indian tribes and the United States); (2) Defendant, its affiliates, and their employees, officers, and directors; (3) overriding royalty interests; (4) Any NYSE or NASDAQ listed company (and its subsidiaries) engaged in oil and gas exploration, gathering, processing, or marketing; (5) royalty owners to the extent that the lease creating the royalty interest expressly and unambiguously authorized all of the deductions taken by Defendant; and, (6) royalty owners who were subjected to the Oklahoma Non-Resident Royalty Interest Withholding Tax for the last two consecutive tax years before suit was filed.

11. The Class Members are so numerous and geographically dispersed that joinder of all members is impracticable. For instance, Defendant has operated over 100 wells which produce gas in Oklahoma and many more in which it holds a working interest, with at least one, and usually more, royalty owners for each well. Defendant has within its possession or control records that identify all persons within the Class.

12. The questions of fact or law common to Plaintiff and the other Class Members include, without limitation, one or more of the following:

(a) The line of demarcation legally between implied Marketable Condition Rule (MCR) leases and Express Deduction (ED) leases;

(b) Whether the implied MCR leases prohibit all of the deductions taken;

(c) Whether all of the raw gas is in marketable condition at the gathering line inlet.

13. Plaintiff is typical of other Class Members, because Defendant pays royalty to Plaintiff and other Class Members using a common method. Defendant pays royalty based upon the net revenue Defendant receives under its marketing contracts. The gas marketing contract terms are unknown to, and unapproved by, royalty owners. The contracts are necessary to place the gas and its constituent parts into Marketable Condition. Plaintiff and the other Class Members are also typical because their leases do not contain an express provision authorizing deductions of all of the gas conditioning costs to convert the gas into Marketable Condition.

14. Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff is a royalty owner paid by Defendant, and understands his duties as Class Representative. Plaintiff has retained counsel competent and experienced in class action and royalty owner litigation.

15. This action is properly maintainable as a class action. Common questions of law or fact exist as to all Class Members, and those common questions predominate over any questions solely affecting individual members of such Class. There is no need for individual Class Members to testify in order to establish Defendant's liability or even damages to the Class Members.

16. Class action treatment is appropriate in this matter and is superior to the alternative of numerous individual lawsuits by the Class Members. Class action treatment will allow a large number of similarly situated individuals to prosecute their common claims in a single forum, simultaneously, efficiently, and without duplication of time, expense and effort on the part of those individuals, witnesses, the courts and/or Defendant. Likewise, class action treatment will avoid the possibility of inconsistent and/or varying results in this matter arising out of the same facts. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action and no superior alternative forum exists for the fair and efficient adjudication of the claims of all Class Members.

17. Class action treatment in this matter is further superior to the alternative of numerous individual lawsuits by the Class Members, because joinder of all Class Members would be either highly impracticable or impossible, and because the amounts at stake for individual Class Members, while significant in the aggregate, are not great enough to enable them to enlist the assistance of competent legal counsel to pursue their claims individually. In the absence of a class action in this matter, Defendant will likely retain the benefit earned by its wrongdoing.

## GAS INDUSTRY BACKGROUND

18. The Class Members own interests in wells that produce gas and constituent products that are subject to uniform accounting methods and to applicable implied marketable product law which requires the lessee to bear all of the costs of placing the products, whether gas or its constituent parts, in Marketable Condition.

19. The lessee under an oil and gas lease has the duty to produce marketable products, and the lessee alone bears the expense in making all products marketable. Gas and its constituent parts are marketable only when in the physical condition to be bought and sold in a commercial marketplace.

20. Only after a given product is in marketable condition does a royalty owner have to pay its proportionate share of the reasonable costs to get a higher enhanced value or price for that particular product.

### The Lessor-Lessee Relationship

21. The lessor owns minerals, including oil and gas, and the lessee has the money, labor, and know-how to extract, condition, and market those minerals. The lessor and lessee enter into a lease that allows the lessee to take the minerals from the lessor's land. The usual revenue split from a well was once 1/8 to the lessor (royalty owner) and 7/8 to the lessee. As the risk of finding that oil and gas has diminished over time due to the prevalence of wells delineating the field, better seismic technology to find oil and gas and drilling rigs becoming more efficient, royalty owners on more recent leases have received 3/16 or even 1/4 of the revenue Oil and gas companies, through undisclosed internal accounting practices, have tried to keep as much of the well revenue as possible. These accounting practices are at the heart of every oil and gas royalty underpayment case.

22. Rather than adopting complete transparency in its royalty calculation formula, Defendant, like most lessees, has guarded its production and accounting processes as confidential or proprietary; thereby depriving the royalty owners of critical information to determine exactly what and how much is deducted. Instead, Defendant generally describes its royalty deduction in very general terms in fine print on its check stubs.

23. If one or more of the royalty owners learn of a lease breach, the royalty owner has only three - all poor - options: (1) confront the lessee and maybe get paid while the lessee continues to retain improperly garnered gas revenues from thousands of other royalty owners; (2) do nothing since it only results in a modest yearly loss to the royalty owner, and individual litigation is too expensive to pursue under those circumstances; or (3) file a class action lawsuit which will last for years and probably will not recover the full loss. In short, if lessee breaches, it may never be held accountable, and if a royalty owner complains, the lessee will still come out ahead, because an individual case is not worth much and a class action rarely requires a full repayment to royalty owners plus pre-judgment interest, plus attorneys' fees and expenses. The class action is the best of the options; hence this suit.

### Residue Gas and Natural Gas Liquids Production

24. The gas is gathered from each well, dehydrated and compressed, through gathering lines that are buried underground and cross many miles of land. The two primary raw gas products, methane, and natural gas liquids ("NGLs"), are further processed at processing plants before being trucked or piped to the commercial market and on to the end-user.

### Wellhead (Basic Separation and Gas Measurement)

25. The diagram below illustrates the gas conditioning process.



Wells produce oil, gas, and a host of other products, such as water, nitrogen, etc., all mixed together in the gas stream.[1] After the stream comes out of the ground, it enters the free water knockout (a/k/a three-phase separator) which separates the products via gravity; water at the bottom, oil in the middle, and gas going out the top. Due to the low technology, the separator is not expensive. The gaseous mixture (with nitrogen, NGLs, and other gaseous substances) passes from the separator into the gas line.[2] The remaining fluid goes through the heater-treater where heat,

---

[1] Hydrocarbons can vary in chemical makeup (from simple methane to complex octane) and in form (from a pure gaseous state to liquid condensate). The non-hydrocarbon makeup of the well-stream that includes natural gas can also include gases such as helium, sulfur, carbon dioxide and nitrogen. This mixture of many gaseous elements and substances is often referred to as the "gas stream" or just "gas."

[2] A minute portion of this raw or mixed gaseous product may be used on a few leased lands to heat the farm house pursuant to a free gas clause in the lease or sometimes sold to a small, limited local market with a finite demand to local irrigators near the wellhead. This limited local market accounts for less than 5% of a producer's gas production.

gravity segregation, chemical additives and electric current break down the mixture more clearly into oil and water. The heater-treater is installed, maintained and takes fuel to operate. The water is drained off and sent for salt water disposal. The oil that is separated at the wellhead is collected in a tank, usually trucked out and sold. (The payment of oil royalties is not at issue in this lawsuit.)

26.     Since the pressure of many wells has depleted over decades of production, sometimes wellhead compressors have been installed to suction gas out of the well or to move the gaseous mixture. These wellhead compressors are installed, maintained and use fuel. The gaseous mixture produced from a single well cannot be processed economically, so the mixtures are "gathered" together through gathering lines and the aggregate mixture is put through a processing plant. *See* Baars, D.L.; Watney, W. Lynn; Steeples, Don W.; and Brostuen, Erling A. "Petroleum: A Primer for Kansas." 2001. <http://www.kgs.ku.edu/Publications/Oil/primer13.html>.



**Gathering Lines (Dehydration, Compression, Condensate)**

27.     As the gaseous mixture from each well enters the gathering line it is measured, in both volume (in Mcf) and quality (Btu content) (combined, "gas measurement," in MMBtu). This

is done in a meter run, which must be constantly maintained to preserve accuracy. Gathering pipelines are made of metal that could be corroded by any remaining water vapor (and other corrosive gases) in the gaseous mixture, so a glycol dehydrator is used to remove the water vapor. Of course, gas cannot move unless it is pressurized, so large gas compressors are installed to move the gas down the gathering line. The gas must be pressurized at a high enough level to overcome the back-pressure in the line and friction. These compressors are expensive and require fuel to operate. The gathering pipelines themselves cost money to lay and maintain. Gas condensate (gas condensed into liquid as it cools) ("Condensate") is collected at points along the gathering lines as a result of cleaning or "pigging the line" and is captured for fractionation later. Finally, gathering lines leak, especially as they age, resulting in lost and unaccounted for gas ("L&U").

### Natural Gas Processing

28.  Once the gas mixture is gathered from a sufficient number of wells (and often from multiple gathering systems), it enters the inlet of the processing plant. To process the gas into methane and mixed NGLs, lessees, such as Defendant, use gas processing plants. Sometimes the processing plant is owned by an unrelated third party and sometimes it is owned in whole or in part by lessees. Sometimes other impurities in the mixture must be removed such as carbon dioxide, nitrogen, or sulfur. Methane gas (sometimes called "residue gas") must meet the quality standards for long-haul pipeline transmission set by the Federal Energy Regulatory Commission (FERC) which is called "pipeline quality gas." NGLs are used as a feedstock in the petrochemical and oil refining industries, and are worth more than methane. NGLs are separated from the gaseous mixture by cooling the mixture until the NGLs become separated. This cooling or Cryogenic recovery method usually takes place at temperatures lower than minus 150°F (the "Cryogenic or cooling process"). The mixture of NGLs is further moved down a liquids pipeline and processed by a

fractionator for separation of the NGLs into their component parts ("T&F" or "fractionation"). This total processing system involves expensive equipment and requires fuel to operate (collectively, the "processing charge" and/or "plant fuel").

29. At the tailgate of the processing plant, at least four products emerge: (1) residue gas (or methane gas); and, (2) NGLs (usually a mixture of NGLs, known as "raw make" or "Y" grade); and (3) other products. None are commercially marketable at that point.

### Marketable Condition for the Products

30. **Methane Gas.** Methane gas (or residue gas) is commercial quality (a/k/a "pipeline quality") at the tailgate of the processing plant only after it is further pressurized to enter the transmission line by a booster compressor.

31. **NGLs.** The raw mixture of NGLs at the tailgate of the processing plant is not commercially marketable. It must be fractionated into commercially marketable products—ethane, propane, butane, isobutane, and natural gasoline. Defendant improperly deducts, in computing royalty for NGLs, processing fees and/or other costs (such as transportation and fractionation, T&F) needed to reach commercially marketable fractionated NGLs. Such deductions are improper.

32. **Drip Condensate.** Plaintiff and Class Members are entitled to royalty on drip condensate which falls out of the gaseous stream on the gathering line, but they are not paid in full, if at all, for such drip condensate.

### Sale of Products

33. To turn the gas products into money, the producer then sells the products. One would expect that such sales would occur in the commercial market place in an arm's length transactions. That, in fact, occurs, but lessees attempt to cover up and manipulate that fact using

self-serving language in gas marketing contracts about title transfers to manufacture a fictitious "sale" before the gas reaches commercial quality for sale.

34.   The "starting price" for gas products is most often established by the lessee through a "weighted average sales price" or an "index price." If Defendant has the market power to, over time, obtain above "index price" in its arm's length sales, then as an agent for the royalty owner, the royalty owner is entitled to this higher price over time as well.

### Different Ways Defendant Underpays Royalty Owners

35.   The extraordinarily large dollars at stake and the one-sided nature of the gas lessor-lessee relationship are constant temptations to lessees to wrongfully retain gas revenues. All payment formulas, contractual relationships, and all calculations are exclusively in the control of lessees, and they involve undisclosed or only vaguely disclosed accounting and operational practices. As a result, there are many ways royalty owners are underpaid on their royalty interests, and they never know the details.

36.   Defendant represents the royalty calculation on the form of a monthly check stub it sends each royalty owner. The check stub shows each royalty owner's interest and taxes (which are not in dispute here), and volume, price, deductions, and value, all of which are disputed.

37.   Defendant underpays Plaintiff and the other Class Members in one or more of the following ways, without limitation:

(a)   Drip Condensate. Plaintiffs and Class Members' wells produce heavy hydrocarbons that condense in the pipeline and are recovered by Defendant (or on behalf of Defendant by its gatherers), but Defendant fails to pay any royalty for that Condensate.

(b)   Natural Gas Liquids (NGLs). Defendant: (i) fails to pay royalty for all of the NGLs produced (some is lost and unaccounted for in the gathering process); (ii) deducts

processing fees and expenses; iii) and reduces payment by T&F all before obtaining commercially marketable fractionated NGLs. NGLs should be paid on a fully fractionated basis and only on arm's length sales.

(c) Residue Gas.

   (i) The starting price paid for residue gas should be an arm's length, third party sales price for residue gas at pipeline quality, but instead of paying on that gross competitive price, Defendant pays on a net price after taking, or allowing to be taken, gas contract deductions.

   (ii) (ii) The volume paid to royalty owners and reflected on their check stubs is less than is the volume actually produced from the wells because, among other things, Defendant improperly deducts in-kind gas used in gathering and processing, and lost gas in the gathering line;

   (iii) Deducting (in cash or in-kind) costs for placing the gas in Marketable Condition, such as gathering, compression, dehydration, treatment, processing, or other deductions is improper, and the check stub reflects $0.00 deductions taken by Defendant, but deductions are in fact made without specifying for what or how much.

38. Throughout the class period, Defendant undertook to represent to Plaintiff and the Class on a monthly basis on their check stubs that a proper accounting had been made, but that accounting was false with nothing to suggest that any, let alone what type or amount, of deductions were made under Defendant's confidential gas contracts.

39. Throughout the class period, the only accounting provided by Defendant to royalty owners on a monthly basis is contained in the check stubs which come to royalty owners, using the

same check stub format and the same check stub software. Plaintiff and the Class members did not and could not have reasonably known about the deductions being taken, and in reliance on the false accounting on monthly checks stubs, they cashed the monthly checks and did not bring a lawsuit to recover the deductions earlier.

40. Since the payment of royalties to royalty owners are open accounts, limitations do not run at all until the final payment on such account has been made, *i.e.*, after the well has ceased production and a final payment has been made.

## COUNT I—BREACH OF LEASE

41. Plaintiff and the other Class Members incorporate by this reference the allegations in paragraphs 1- 40 and 46-54.

42. Plaintiff and the other Class Members entered into written, fully executed, oil and gas leases with Defendant, and those leases include implied covenants requiring Defendant to place the gas and its constituent parts in Marketable Condition at Defendant's exclusive cost. The leases also place upon Defendant the obligation to properly account for and pay royalty interests to royalty owners under the mutual benefit rule.

43. At all material times, Plaintiff and the other Class Members have performed their terms and obligations under the leases.

44. Defendant breached the implied covenant of the leases by its actions and/or inactions.

45. As a result of Defendant's breaches, Plaintiff and the other Class Members have been damaged through underpayment of the actual amounts due.

## COUNT II—BREACH OF FIDUCIARY DUTY

46. Plaintiff and the other Class Members incorporate by this reference the allegations

in paragraphs 1 through 45.

47. The Class members have wells that have unitized under 52 O.S. §§ 287.1-287.15 and/or 52 O.S. § 87.1.

48. Defendant has a fiduciary duty as a result of the above mentioned statutes, the Oklahoma Corporation Commission (OCC) orders made pursuant to those statutes, and/or the unitization order and agreement with the Class members based on field-wide units or secondary recovery under 52 O.S. §§ 287.1-287.15 and also by the creation of drilling and spacing units under 52 O.S. § 87.1.

49. Defendant is the unit operator by appointment from the Oklahoma Corporation Commission for Class members.

50. Defendant breached its fiduciary duty to the Class members by failing to properly report, account for, and distribute gas proceeds to the Class members for their proportionate royalty share of gas production.

51. If the statute of limitations applies at all to an open account and is not tolled as set forth above, the statute of limitations is not even triggered for breach of fiduciary duty in this case because the Class members did not know and could not have known of Defendant's failure to make proper payments which was based solely on accounting information in the hands of Defendant.

52. As a direct and proximate result of Defendant's conduct in breaching its fiduciary duties to the Class members entitles them to recover actual damages.

53. Plaintiff and the Class do not now seek but reserve the right to amend to seek punitive damages after taking discovery.

54. Plaintiff and the Class are also entitled to and seek pre-judgment interest, post-judgment interest, attorneys' fees from the common fund, expenses, and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for an Order and Judgment against Defendant as follows:

A. Certifying this action pursuant to as a class action, appointing Plaintiff as the class representative, and Plaintiff's counsel as class counsel, with reasonable notice to be given to the Class Members;

B. Awarding Plaintiff and the other Class Members damages including, but not limited to, interest at the highest allowable rate (such as lawful, equitable, or internal rate of return);

C. Granting Plaintiff and the other Class Members the costs of prosecuting this action, together with reasonable attorney's fees out of the recovery;

D. Although Defendant knows how much it has been deducting in whole or in part from valuable gas constituents, Plaintiff does not have access to that information yet, so individually, Plaintiff does not know whether class-wide damages will exceed $5 million, exclusive of interest and costs; and,

E. Granting such other relief as this Court may deem just, equitable and proper.

## JURY DEMAND

Plaintiffs and the other Class Members demand trial by jury regarding all issues that can be tried to a jury under applicable law.

**ATTORNEYS' LIEN CLAIMED.**

Rex A. Sharp OBA#011990
Gunderson Sharp, L.L.P.
5301 W. 75th Street
Prairie Village, KS 66208
(913) 901-0500
(913) 901-0419 fax
rsharp@midwest-law.com

Counsel for Plaintiff